**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: SAXBY'S COFFEE WORLDWIDE, LLC,** | : | **Chapter 11** |
| | : | |
| **Debtor(s).** | : | **Bky. No. 09-15898 ELF** |
| | : | |

# MEMORANDUM

## I.

On August 20 and 23, 2010, the confirmation hearing was held in the above chapter 11 bankruptcy case. At the hearing, Debtor Saxby's Coffee Worldwide, LLC ("the Debtor") requested confirmation of its Second Amended Chapter 11 Plan of Reorganization ("the Plan") over the objections of the U.S. Trustee and creditors Marshall Katz, Greg Bayer and John Larson.[1] After the hearing, the Debtor, the U.S. Trustee and Katz filed post-hearing memoranda of law in support of their respective positions, the last of which was filed on September 9, 2010.

For the reasons set forth below, confirmation of the Plan will be denied.

## II.

### A.

The background of this case was described in an earlier reported decision, In re Saxby's Coffee Worldwide, LLC, 2009 WL 4730238 (Bankr. E.D. Pa. Dec. 4, 2009), and is well known

[1] Greg Bayer and John Larson joined in the U.S. Trustee's objection. (See Docket Entry # 320). Marshall Katz filed a separate objection to confirmation. (See Docket Entry # 319). The Pennsylvania Department of Revenue also filed an objection , but later withdrew it. (See Doc. #'s 284, 372).

to the parties. Therefore, I will summarize the background only to the extent necessary to provide the contextual framework of the present controversy.

The Debtor was formed in July 2007 to acquire the assets and assume certain liabilities of Saxbys Coffee, Inc. ("SCI"). SCI was a franchisor of retail coffee shops. Since its acquisition of the SCI assets, the Debtor also has operated as a coffee shop franchisor. The Debtor-LLC's two members are Joseph Grasso ("Grasso") and Kevin Meakim ("Meakim"). Upon acquiring the SCI assets, Grasso and Meakim hired Nicholas Bayer ("N. Bayer"), SCI's former President and controlling shareholder, as the Debtor's chief executive officer.

After the Debtor's formation, a number of SCI's minority shareholders and creditors filed various lawsuits against the Debtor (collectively, "the State Court Litigation"). In certain lawsuits, the plaintiffs alleged that the Debtor's acquisition of SCI's assets was fraudulent and that the Debtor was liable for SCI's debts based on the doctrine of successor liability. Certain plaintiffs also named N. Bayer, Grasso, Meakim and Coffee Shops International, LLC ("CSI") as defendants in some of the state court lawsuits. CSI is a company also controlled by Grasso and Meakim. CSI is in the business of roasting and distributing coffee beans. CSI supplies product to the Debtor and its franchisees.

In August 2009, the Debtor commenced this bankruptcy case, at least in part, to curtail the ongoing expenses associated with the State Court Litigation. The bankruptcy filing stayed the State Court Litigation as to the Debtor, but not as to N. Bayer, Grasso and Meakim. After the bankruptcy filing, one creditor, Marshall Katz, obtained an unliquidated judgment against N. Bayer, Grasso and Meakim in an action filed in Illinois. The Illinois court entered the judgment as a sanction for the defendants' failure to comply with the court's pretrial discovery orders.

On December 4, 2009, on motion of the Debtor, this court entered an order preliminarily enjoining various entities from commencing or continuing any judicial, administrative, or other legal action or legal proceeding against N. Bayer, Grasso and Meakim. The court entered the injunction in order to "provide the Debtor's key management personnel the freedom from personal distraction so that they can devote their unfettered efforts to the Debtor's reorganization, thereby giving the Debtor an opportunity to formulate and attempt to confirm its plan of reorganization." Saxby's Coffee Worldwide, 2009 WL 4730238, at *12. The injunction initially was entered for a finite period of approximately two months. In subsequent hearings, the Debtor demonstrated sufficient progress in the reorganization process to warrant extensions of the injunction. By order dated May 19, 2010, the court extended the injunction "through the completion of the confirmation hearing." (Adv. No. 09-340, Doc. # 84).

**B.**

The Plan presently being considered for confirmation divides creditors into seven separate classes.

| Class | Description |
|---|---|
| Class I | administrative claims |
| Class II | secured claim of Beneficial Savings Bank |
| Class II | allowed priority, unsecured claims |
| Class IV | parties to executory contracts (divided into four sub-classes) |
| Class V | claim of Bancorp Bank (see n.2, infra) |
| Class VI | general unsecured claims |
| Class VII | equity interest holders |

The Plan states that only Classes II, IV, V, VI and VII. are impaired under the Plan. In its Report of Plan Voting (See Doc. # 298), the Debtor reported that the Class II (Beneficial Savings Bank) and Class V (Bancorp)[2] voted to accept the Plan and that the Class IV (holders of executory contracts) and Class VI (general unsecured) creditors voted to reject the Plan.[3]

The Debtor requests that the Plan be confirmed under 11 U.S.C. §1129(b). The Debtor asserts that a proposed contribution to the Debtor of $250,000.00 by Grasso and Meakim is sufficient to satisfy the "new value" corollary/exception to the absolute priority rule and to permit the court to find that the Plan is "fair and equitable" within the meaning of 11 U.S.C. §1129(b)(2)(B). See generally In re Haskell-Dawes, Inc., 199 B.R. 867 (Bankr. E.D. Pa. 1996) (discussing the new value corollary/exception to the absolute priority rule).

The centerpiece of the Debtor's reorganization strategy is contained in Paragraph V.B.7 of the Plan. Paragraph V.B.7. provides for what is commonly known as a "third party release." It effectively would enjoin any party that has asserted or could assert a claim against the Debtor from, inter alia, commencing or continuing any litigation against N. Bayer, Grasso and Meakim

---

[2] Bancorp extended credit to the Debtor on a secured basis prior to the bankruptcy case and holds a claim of approximately $1 million. Bancorp concedes that its security interest in the Debtor's assets was unperfected on the petition date and is subject to avoidance. Under the Plan, Bancorp will provide the Debtor with exit financing. See n.4, infra. As part of the consideration for the exit financing, the Debtor separately classifies Bancorp as a Class V claim, grants Bancorp a lien on all of its assets to secure the prepetition indebtedness and provides for full payment of the claim. The separately classified, general unsecured creditors (Class VI) are to be paid pro rata from a fund of $120,000.00, paid over twenty-four (24) months following confirmation. Based on the present amount of allowed unsecured claims, the distribution to Class VI claims likely would be substantially less than ten percent (10%).

[3] As to the Class VII interest holders, the Report of Plan Voting states that "[t]he interest holders support confirmation of the Plan, however, did not vote, nor was their vote solicited." Report of Plan Voting 5.g.

and CSI (collectively, "the Releasees") based on claims arising before the commencement of the Debtor's bankruptcy case, including the enforcement of any judgments against the Releasees (this provision hereafter referred to as "the Release").

The Debtor asserts that the Release is essential to the Plan for two reasons. First, the Debtor claims the Release is necessary to free its principals from the distractions of the State Court Litigation so that they can devote their full efforts to the post-confirmation implementation of the Debtor's reorganization plan. CSI is included in the Release because it will provide the Debtor with a financial contribution in the form of rebates on the Debtor's monthly account payable resulting from the product that the Debtor purchases from CSI. The CSI rebate reduces the Debtor's cash obligation and is an important component of the Debtor's post-confirmation cash management strategy. Second, the Debtor asserts that the Plan is dependent on the exit financing that Bancorp Bank has agreed to provide, see n.2, supra,[4] and presented evidence at the confirmation hearing that Bancorp will not provide the financing unless the Release is included in the Plan. The Debtor concedes that without the exit financing, the Plan is not feasible and therefore, not confirmable.

## C.

The most comprehensive set of objections to confirmation were those filed by the U.S. Trustee. (Docket Entry # 314). The U.S. Trustee asserts that the Plan may not be confirmed

---

[4] The exit financing consists of a $300,000.00 loan to the Debtor and a $250,000.00 personal loan to Grasso and Meakim, which they will contribute to the Debtor. The loan to the Debtor is to be guaranteed by the Debtor's principals, N. Bayer, Grasso and Meakim. Ostensibly, the bank's underwriters deem the exit financing package too risky if the principals remain subject to the State Court Litigation.

because it fails to satisfy the following confirmation requirements:

- 11 U.S.C. § 1129(a)(3) - The Plan has not been proposed in good faith.
- 11 U.S.C. § 1129(a)(8) - All impaired classes of creditors have not accepted the Plan.
- 11 U.S.C. § 1129(a)(9) - All allowed administrative expenses will be not paid in full.
- 11 U.S.C. § 1129(a)(11) - Confirmation of the Plan is likely to be followed by liquidation or further financial reorganization.
- 11 U.S.C. § 1129(a)(12) - All fees payable under 28 U.S.C. § 1930(a)(6) have not been paid as of the date set for hearing on the Debtor's request for confirmation of its Plan and/or the Plan fails to provide for the continued payment of such fees until the Debtor's case is closed.
- 11 U.S.C. § 1129(b) - The Plan does not provide fair and equitable treatment to all parties in interest and the proposed "new value contribution" is insufficient to meet any new value exception to the absolute priority rule
- 11 U.S.C. §524(e) - The permanent injunctions and releases afforded non-debtor third parties under the Plan violate § 524(e) of the Code in that these provisions are not fair, are not supported by consideration, are not necessary for the reorganization of the Debtor, and have not been explicitly accepted by creditors voting in favor of the Plan.

To resolve this contested matter, I only need consider the last objection listed above pertaining to the Release, which I shall treat as an objection asserting that the Plan does not comply with 11 U.S.C. §1129(a)(2) (plan must comply "with the applicable provisions of this title").

**III.**

As stated, the Release found in Paragraph V.B.7. of the Plan is at the heart of this contested matter. It provides for a third party release in favor of N. Bayer, Grasso, Meakim and

CSI. The Release would permanently enjoin all entities (except those entities holding what the Debtor terms "statutory enforcement rights," (see Debtor's Memorandum of Law at 6), from inter alia, commencing or continuing any litigation against the Releasees based on claims arising before the commencement of the Debtor's bankruptcy case or enforcing any prepetition judgments against the Releasees.

Paragraph V.B.7. of the Plan states:

> *Except as otherwise provided under this Plan, all holders of claims or interests, or any person who may hold a claim or equity security interest, or alleged claim or any claim to any ownership interest are PERMANENTLY ENJOINED, from and after the Effective Date, (a) from commencing or continuing any action or other proceeding of any kind on any such Claim or Equity Security Interest against the Debtor, the Bankruptcy Estate, the Reorganized Debtor, or any individual who may have held an ownership interest in the Debtor expressly including Joseph Grasso, Kevin Meakim, Nicholas Bayer, and Coffee Shops International, LLC, unless a previous Order modifying the stay provided under 11 U.S.C.§362 was entered by the Bankruptcy Court; (b) from the enforcement, attachment, collection, or recovery by any manner or means of any Judgment, award, decree, or Order previously entered against the Debtor in any Court; and (c) from creating, perfecting, or enforcing any lien, claim, or encumbrance of any kind against the property or interests in property of the Debtor or formerly owned by the Debtor which is conveyed or effectively transferred to the Reorganized Debtor pursuant to this Plan of Reorganization.*

(italics in original).

On its face, Paragraph V.B.7. conflicts with 11 U.S.C. §524(e), which provides that a debtor's discharge "does not affect the liability of any other entity . . . ." See First Fidelity Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993). The Debtor asserts, however, that this court may nonetheless approve a chapter 11 plan that includes a third party release pursuant to its authority under 11 U.S.C. §105(a).

There may be an exception to §524(e)'s restriction in "extraordinary cases." See In re Continental Airlines, 203 F.3d 203, 212 (3d Cir. 2003). It is presently unclear whether such an

exception exists in this Circuit and, if so, "the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible." Id. at 214. Like the Court of Appeals, in Continental Airlines, in this case, I find it unnecessary to decide that question. If it is permissible for a chapter 11 plan to include a third party release, the Release in this case "does not pass muster under even the most flexible tests for the validity of non-debtor releases." Id.

The "most flexible" test for non-debtor releases was articulated recently in In re South Canaan Cellular Investments, Inc., 427 B.R. 44 (Bankr. E.D. Pa. 2010):

> (1) whether the third party who will be protected by the injunction or release has made an important contribution to the reorganization; (2) whether the requested injunctive relief or release is "essential" to the confirmation of the plan; (3) whether a large majority of the creditors in the case have approved the plan; (4) whether there is a close connection between the case against the third party and the case against the debtor; and (5) whether the plan provides for payment of substantially all of the claims affected by the injunction or release.

427 B.R. at 72; see also In re Exide Technologies, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003); In re Zenith Electronics Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999).

Here, the Plan fails to meet at least two of the elements of the "flexible test." It has not received the support of the majority of creditors who voted. Indeed, the unsecured creditors (Class VI) rejected the Plan. (See Report of Plan Voting ¶5.f) (Doc. # 298). I am unaware of any reported decision in which a third party release has been approved as part of a chapter 11 plan that was confirmed under §1129(b)(2)(B). Nor does the Plan provide for payment of "substantially all" of the claims affected by the Release. For these reasons alone, I decline to exercise any authority this court may have to confirm a chapter 11 plan that includes the Release. See Exide Technologies, 303 B.R. at 74.

By way of further explanation, I perceive two fundamental flaws in the Debtor's legal

theory that compel the decision to deny confirmation.

The first flaw is revealed by the Debtor's explanation that the Release is designed "to stop the lunacy." (Debtor's Memorandum at 10). The "lunacy" the Debtor refers to is its belief that the claims lodged against the Debtor and the Releasees by SCI's creditors and minority are utterly without merit. The Debtor perceives those claims as groundless because they are based on premise that the Debtor's purchase of SCI's assets was a fraudulent transaction. Perhaps the Debtor's strongly held view of the righteousness of its position was reinforced by this court which, after a two-day hearing, "temporarily" sustained the Debtor's objection to Katz's Proof of Claim and "temporarily" disallowed the claim. (Doc. # 373); see Fed. R. Bankr. P. 3018(a) (authorizing the court to temporarily allow a claim for purposes of acceptance or rejection of a plan). After the hearing, the court explained the basis of decision in a lengthy bench opinion, which reviewed the evidence and made ("temporary") findings that the transaction in which SCI sold its assets to the Debtor was not fraudulent.

The rationale behind the decision temporarily disallowing Katz's claim certainly casts some doubt on the validity of Katz's claims against the Releasees and, by logical extension, on the validity of certain other claims asserted against the Debtor and the Releasees. However, the Debtor reads too much into the decision. Whatever this court's "temporary" conclusions may have been regarding the merits of Katz's claim against the Debtor and whatever this court might conclude at the end of a final hearing in the matter and whatever the "true merits" of Katz's claims against the Releasees may be, Katz holds a valid state court judgment in Illinois against the Releasees. For bankruptcy purposes, the existence of that judgment settles the merits.

It is fundamental to our federal constitutional system that this court respect the Illinois

court's ability to fairly and competently adjudicate the cases it hears and to honor the judgments it enters. See In re Halas, 226 B.R. 618, 623 (Bankr. N.D. Ill. 1998) (judicial comity mandates that courts of one jurisdiction give effect to judicial decisions of another not only as a matter of obligation, but also out of deference and respect); see generally Juidice v. Vail, 430 U.S. 327, 334 (1977) (holding that certain abstention doctrines prohibit federal court interference with state court civil proceedings because, in our federal system, the principle of comity requires that federal courts demonstrate "a proper respect for state functions") (quoting Younger v. Harris, 401 U.S. 37, 44 (1971)). Thus, as a matter of law, I cannot consider the Illinois proceedings a manifestation of legal "lunacy." To the contrary, it is imperative that I accord full faith and credit to the judgments entered against the Releasees in Illinois. To the extent that the Debtor's request that this court exercise its §105(a) powers is grounded in the premise that equity requires the nullification of what the Debtor perceives as erroneous and unjust state court judgments against the non-debtor Releasees, the request is wholly insupportable.

The second flaw in the Debtor's legal theory is that any decision confirming a reorganization plan that includes a third party release is necessarily more nuanced than the Debtor suggests. It cannot be granted simply because it is necessary for the Debtor's reorganization. There are limits to this court's power to protect a debtor from conduct directed by one non-debtor against other non-debtor entities, even though the conduct may interfere with its reorganization. In some cases, those limits are jurisdictional. See, e.g., In re W.R. Grace & Co., 591 F.3d 164, 171-73 (3d Cir. 2009) (bankruptcy court lacked subject matter jurisdiction to enjoin creditor from proceeding against third party who held a potential common law indemnity claim against the debtor that had not yet accrued and would require another lawsuit be filed

before there could be any effect on the debtor's reorganization). Other limits under 11 U.S.C. §105(a) derive from the basic principle that the court must exercise restraint before employing the potentially broad equitable power afforded under §105(a) to intervene in the legal relationships among non-debtors.

As I read the case law on the confirmation of reorganization plans that include a third party release, see Kyung S. Lee, et al., Revisiting the Propriety of Third-Party Releases of Nondebtors, 19 J. Bankr. L. & Prac. 4, Art. 6 (Aug. 2009) (collecting cases), even if a bankruptcy court has both the subject matter jurisdiction under 28 U.S.C. §1334(a) and the general legal authority under 11 U.S.C. §105(a) to confirm a plan that includes a third party release, it is an nonetheless an extraordinary judicial act. The Bankruptcy Code does not lightly authorize the bankruptcy court to deprive one non-debtor of its legal remedies against another non-debtor (if it does so at all). The goal of a debtor's reorganization, while worthy, is not a societal value that necessarily trumps all others. Restricting the exercise of a non-debtor's legal remedies against another non-debtor against that creditor's will is supported by equity only after the court has considered, in a comprehensive fashion, the impact that confirmation of the plan will have on all of the parties affected. Courts may approve third party releases only when the reorganization plan is widely supported by the creditor constituency that includes the parties being restrained, accords significant benefits to that constituency and the court is satisfied that the creditors being restrained also are being treated fairly. It is a very narrow legal realm in which a party's legal rights may be restricted because the needs of the many outweigh the rights of the few.

This analysis mandates the denial of confirmation of the Debtor's plan. The general unsecured creditors would receive only a modest distribution under the Plan and have rejected

the Plan. The parties that would be restrained from proceeding against the Releasees would receive little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees. If the Plan were confirmed, the rights of the restrained parties effectively would be nullified without any commensurate benefit to them under the Plan.

In short, while the Debtor's reorganization goals are worthy, the end does not justify the means. To confirm the Plan proposed here would establish an unprecedented, unwarranted and inequitable expansion to any exception to 11 U.S.C. §524(e) that may exist.

In light of my denial of confirmation on these grounds, it is unnecessary to reach the other objections raised by the U.S. Trustee and Katz.

## IV.

For the reasons set forth above, confirmation of the Debtor's Plan of Reorganization will be denied.

A hearing on the U.S. Trustee's Motion to Dismiss or Convert this case is presently scheduled on September 29, 2010. At that time, the Debtor can advise the court whether it wishes propose and seek confirmation of a further amended chapter 11 plan. If the U.S. Trustee wishes to press her motion, the Debtor will need to make some showing regarding the likely terms and the feasibility of any amended plan it might propose. Such a showing is necessary in light of the evidence the Debtor presented at the confirmation hearing that Bancorp's exit financing was necessary and was conditioned on the confirmation of a plan containing third party release, a condition that cannot be satisfied.

Consistent with this Memorandum, an order denying confirmation of the Debtor's Second Amended Chapter 11 Plan of Reorganization will be entered.

**Date:** **September 22, 2010**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**